*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
May 30, 2024

v

ZEBADIAH JOSEPH SORIANO,

        Defendant-Appellant.

No. 359165
Grand Traverse Circuit Court
LC No. 20-013669-FH

Before: SWARTZLE, P.J., and SERVITTO and GARRETT, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial, conviction of assault with intent to commit criminal sexual conduct (CSC) involving penetration, MCL 750.520g(1).[1] The court sentenced him to three years' probation, with six months to be served in jail. We affirm.

Defendant's conviction arises from his attempted sexual assault of AC after he used LSD. Defendant and AC had been involved in a platonic relationship for several months, and AC previously told defendant that she was not interested in dating him. While the two were at AC's home on the evening of November 20-21, 2020, they both consumed LSD. AC took one tablet, but defendant claimed to have consumed six tablets. A short while later, defendant began to act strangely and make bizarre statements. He pulled off his socks, pants, and underwear, and said to AC, "Are we going to do this?" Defendant then forced himself on top of AC as she was on a couch. AC physically and verbally resisted, but defendant forced her down and groped her. AC was able to get away and started toward the stairs, but defendant caught her, placed his arm around her throat, pulled her to her knees, and applied pressure to her neck. AC again was able to get away and ran upstairs, where her mother was sleeping.

Defendant followed AC up the stairs, but was confronted by AC's mother on the landing at the top of the stairs. According to AC's mother, defendant was naked from the waist down, acted agitated and aggressive, and was making incoherent statements. While AC's mother was

---

[1] The jury acquitted defendant of an additional charge of assault by strangulation, MCL 750.84.

trying to help defendant, he fell down the stairs and then ran out of the house. The police responded and found defendant in a wooded area, approximately a quarter mile away. Because defendant was still acting bizarre and making nonsensical statements, the police took defendant to a hospital to determine if he needed medical care. While at the hospital, after defendant began to calm down, he asked to speak with Deputy Mike Ruggles, who was stationed nearby. Before speaking to defendant, Deputy Ruggles advised defendant of his constitutional rights. After being advised of his rights, defendant indicated that he still wanted to speak to Deputy Ruggles. Defendant admitted taking LSD and trying to have sex with AC, even after she refused. Defendant also spontaneously stated, "I am a rapist. I am f**ked."

Before trial, defendant moved to suppress his statements at the hospital, arguing that they were not knowingly and voluntarily made due to his advanced intoxication. Following an evidentiary hearing, the trial court denied the motion. Part of the defense strategy at trial was to question whether defendant's statements at the hospital were reliable because of his intoxicated state.

The jury found defendant guilty of assault with intent to commit CSC involving penetration, but acquitted him of assault by strangulation. The trial court sentenced defendant to three years' probation, with six months to be served in jail, and ordered that he be subject to lifetime registration as a sex offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. Defendant filed a motion for a new trial, raising several of the issues that he now raises on appeal, but the trial court denied the motion.

## I. DEFENDANT'S HOSPITAL STATEMENTS

Defendant first argues that the trial court erred by denying his motion to suppress his statements at the hospital. Defendant argues that the statements should have been suppressed because he was still under the influence of LSD when he made the statements, which, along with other factors, prevented the statements from being knowingly and voluntarily made. We disagree.

A trial court's decision on a motion to suppress is reviewed de novo, but any factual findings by the trial court are reviewed for clear error. *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). A finding is clearly erroneous if, after reviewing the entire record, the Court is left with a definite and firm conviction that a mistake was made. *Id.*

The state and federal constitutions guarantee the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. To safeguard that right, statements made by an accused while subject to custodial interrogation are not admissible unless, prior to questioning, the accused is warned that (1) he has a right to remain silent, (2) his statements can be used against him, and (3) he has the right to counsel. *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966); *People v Daoud*, 462 Mich 621, 633; 614 NW2d 152 (2000); *People v Harris*, 261 Mich App 44, 55; 680 NW2d 17 (2004). For an accused's statements to be admissible, the accused must have voluntarily, knowingly, and intelligently waived his rights. *Miranda*, 384 US at 444.

Whether an accused's statement was voluntary is determined by examining police conduct. *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). "[T]he voluntariness prong cannot be resolved in defendant's favor absent evidence of police coercion or misconduct." *People*

*v Howard*, 226 Mich App 528, 543; 575 NW2d 16 (1997). "In contrast to the voluntary prong, determining whether a suspect's waiver was knowing and intelligent requires an inquiry into the suspect's level of understanding, irrespective of police behavior." *Daoud*, 462 Mich at 636. Whether a statement was voluntarily, knowingly, and intelligently made is determined by examining the totality of the circumstances. *Id.* at 633-634.

In support of his position, defendant relies on *People v Shipley*, 256 Mich App 367, 373-374; 662 NW2d 856 (2003). There, this Court stated:

> Whether a statement was voluntary is determined by examining the conduct of the police. *People v Howard*, 226 Mich App 528, 538; 575 NW2d 16 (1997). Factors to consider include:
>
> > "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.
> >
> > "The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." [*People v Sexton (After Remand)*, 461 Mich 746, 753; 609 NW2d 822 (2000), quoting *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

Initially, there is no evidence of police misconduct in this case. The evidence clearly demonstrated that when defendant was first taken into custody, he was not in any condition to give a statement. There was no dispute that he had ingested LSD and was still displaying the effects of that drug by making nonsensical statements and experiencing hallucinations when he was initially taken into custody. The police were aware of his condition and did not attempt to question defendant at that time. Indeed, they took him to the hospital because they were concerned for his welfare. While at the hospital, he continued to display erratic behavior and was placed in a restraint chair for his safety. However, he eventually stopped making erratic movements and statements, and sat still in his chair. He demonstrated an awareness that he was in a hospital and restrained, although he was confused about why he was there. He also realized that an officer, Deputy Ruggles, was stationed outside his room. Significantly, the police did not initiate any interrogation of defendant. Rather, it was defendant who asked to speak with Deputy Ruggles. Before speaking to defendant, Deputy Ruggles advised him of his *Miranda* rights. After defendant indicated that

he still wished to speak to Deputy Ruggles, the questioning that followed lasted approximately 10 minutes.

Although defendant asserts that he was also sleep deprived and had not eaten when he gave his statements, there is no evidence that the police exploited these conditions to coerce a statement. During the evidentiary hearing, defendant did not complain that his lack of sleep contributed to his decision to waive his rights and give a statement. He only explained that his lack of sleep may have affected his memory, in addition to his use of LSD. Notably, however, defendant claimed that he had memory problems even when he was not using LSD. In any event, the police did not begin to question defendant until after he expressed a willingness to talk, and then advised defendant of his *Miranda* rights before any questioning, after which defendant indicated that he still wished to speak and answer questions. The questioning that followed was not extensive, lasting approximately 10 minutes. Moreover, there is no evidence that defendant ever asked for any food or water before being questioned. Defendant was already receiving medical attention at the hospital and there is no evidence that the police prevented him from receiving any care from hospital staff. Although defendant was restrained in a chair, those restraints were placed on him for his safety because of his earlier erratic behavior, not because he was in police custody. In sum, there is no evidence that defendant's statements were a product of police misconduct.

Furthermore, evidence also supports the trial court's findings that defendant's statements were knowingly and intelligently made. Although LSD is a mind-altering substance, the fact that a suspect may have been under the influence of drugs or alcohol is not dispositive of the issue of voluntariness. *People v Leighty*, 161 Mich App 565, 571; 411 NW2d 778 (1987).[2] Defendant's conduct and statements at the hospital indicated that he was aware of his surroundings and lucid enough to ask to speak to Deputy Ruggles, despite any lingering effects from the LSD that he had consumed approximately six to seven hours earlier. At that point, he was no longer exhibiting hallucinatory or erratic conduct, or making nonsensical statements. According to Deputy Ruggles, defendant appeared to think really hard about what was going on and understood the severity of the situation he was in, and he gave answers that were responsive to Deputy Ruggles's questions, which explored the nature of defendant's relationship with the victim, the type and amount of drug defendant had consumed, whether defendant attempted to have sex with the victim, and whether the victim consented to any sexual conduct.

Defendant also emphasizes that he was only 18 years old at the time of the interview and had no known previous experience with the criminal justice system. Recently, in *Stewart*, 512 Mich at 490-493, the Court did give more weight to the defendant's age in a case involving the admissibility of an 18-year-old accused's custodial statements in light of the Court's observations in *People v Parks*, 510 Mich 225, 250-251; 987 NW2d 161 (2022), that young offenders are not yet fully developed in their decision-making abilities and are more susceptible to negative outside

_____

[2] Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority. *In re Stillwell Tr*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012).

influences.[3] However, an accused's age is only one factor to consider in determining whether a youthful suspect's statements are voluntary. *Stewart*, 512 Mich at 492-493. Defendant's own testimony indicated that he was aware of the serious nature of the proceedings he was facing. His young age and inexperience do not show that he did not understand the circumstances at the time he gave his statement. Moreover, "to knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him." *Daoud*, 462 Mich at 636.

Defendant argues that information in his presentence investigation report that he likely is on the autism spectrum and struggled in school further supports his argument that he lacked the ability to knowingly and intelligently waive his *Miranda* rights and give a statement. However, the information on which defendant relies merely indicates that his mother had suspicions that he might have a form of autism because two of his siblings had been diagnosed with the condition, but no formal diagnosis of that condition had ever been made. More significantly, no evidence of that condition, or how any such condition may have affected defendant's ability to knowingly and intelligently waive his rights and give a statement, was introduced at the evidentiary hearing. Likewise, the presentence report indicates that defendant had "C" grades in high school, but no evidence was presented that he lacked the intellectual capacity to be able to understand his rights and knowingly and intelligently waive those rights and give a statement. Thus, the trial court did not err by denying defendant's motion to suppress his statements at the hospital.

Even assuming, arguendo, that defendant's hospital statements were admitted in violation of his constitutional rights against self-incrimination, any such error in their admission was harmless. "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Henry (Aft Rem)*, 305 Mich App 127, 144; 854 NW2d 114 (2014), quoting *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010) (alteration in original).

AC testified at trial that at some point after she and defendant had both taken LSD on the night of November 20, 2020, defendant, without preamble, suddenly walked near where she was sitting on the couch, pulled off his pants, underwear, and socks, and said, "We're going to do this, right? We're going to do this." AC testified that she told defendant "No—I don't want to. No." According to AC, defendant then put his arm on her chest and pushed her back further into the couch. AC testified that defendant kept saying, "We're going to do this," and she kept repeating to defendant, "We're not going to do this. I'm not interested in you. Stop." Defendant then began groping her breast and trying to get her shirt off. AC managed to push defendant off her and start toward the stairs, intending to go upstairs to her mother for help. AC testified that as she reached the bottom of the stairs, however, defendant came up behind her and put her in a chokehold causing her to fall to her knees and she became lightheaded. AC again managed to get away and got up the stairs where she could only gasp out "he tried to" several times before defendant ran up the stairs.

---

[3] In *Parks*, the Supreme Court held that a mandatory life-without-parole sentence for an 18-year-old homicide offender is unconstitutionally cruel or unusual considering the mitigating characteristics of youth, specifically late-adolescent brain development.

Absent defendant's statements made at the hospital, AC's testimony provides more than sufficient evidence for a reasonable jury to have found defendant guilty. A victim's testimony can be sufficient, by itself, to support a criminal sexual conduct conviction. *People v Szalma*, 487 Mich 708, 724; 790 NW2d 662 (2010). See also MCL 750.520h ("The testimony of a victim need not be corroborated in prosecutions under sections 520b to 520g."). However, in this case, AC's testimony is corroborated, in part, by testimony from both her mother and Deputy Ruggles.

AC's mother testified that she was awakened in the early morning hours of November 21, 2020, by AC standing in her bedroom, shaking, and repeating "he tried to." AC's mother testified that she was confused, but heard a commotion coming from downstairs, so got out of bed and started toward AC and the bedroom doorway. As she reached the doorway, AC's mother saw defendant running up the stairs, naked from the waist down, and heard him yelling "I'm dead. We're all dead." Defendant eventually ran out the front door, still naked from the waist down and AC's mother called the police. Deputy Ruggles testified that defendant was found outside, near AC's home, still naked from the waist down, a short time after AC's mother called the police.

AC unequivocally testified that defendant stripped off his pants and underwear, repeatedly told her "we're going to do this," pushed her onto the couch, fondled her breast, then choked her when she first got away from him. AC's testimony, particularly when corroborated by other witness testimony, makes it is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent any potential error in the admission of his statements made while in the hospital. *Henry (Aft Rem)*, 305 Mich App at 144.

Defendant also argues that trial counsel was ineffective for not consulting and retaining a toxicology expert to address the impact of defendant's LSD consumption on the voluntariness and reliability of his defendant's statements at the hospital. Defendant argues that there is a reasonable probability that the trial court would have decided the suppression issue differently if expert testimony had been presented at the suppression hearing. Additionally, he argues that even if the statements had not been suppressed, an expert should have been called at trial to provide the jury with a basis for questioning the reliability of defendant's statements at the hospital.

The trial court rejected defendant's ineffective-assistance claim when it denied defendant's motion for a new trial, but it did not conduct an evidentiary hearing on the issue of ineffective assistance of counsel. Accordingly, our review of that issue is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

Claims of ineffective assistance of counsel involve mixed questions of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews any factual findings by the trial court for clear error, and any constitutional determinations de novo. *Id*. To establish ineffective assistance of counsel, defendant must first establish that counsel's performance was deficient, which involves consideration "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Defendant must also demonstrate that he was prejudiced by counsel's error. To establish prejudice, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694.

"Reasonable probability means 'a probability sufficient to undermine confidence in the outcome.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. Defendant has the burden of establishing the factual predicate for his ineffective-assistance claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). In this regard, defendant must overcome a strong presumption that his attorney exercised sound trial strategy and show that, but for counsel's error, the outcome of the trial would have been different. *Id*. at 368-369. But counsel's strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable." "[A] court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014).

Preliminarily, we note that the trial court erroneously analyzed defendant's ineffective-assistance claim to determine whether the failure to call an expert deprived defendant of a "substantial defense." In *People v Jurewicz*, 506 Mich 914; 948 NW2d 448 (2020), our Supreme Court disavowed this type of analysis, explaining:

> The defendant was not required to show, in order to obtain relief for ineffective assistance of counsel, that trial counsel's failure to call witnesses deprived him of a substantial defense. Rather, a claim of ineffective assistance of counsel premised on the failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel, i.e., a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51 (2012); see also *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d [674] (1984). On remand, the Court of Appeals should resolve the defendant's claim of ineffective assistance of counsel under this standard.

Despite the trial court's faulty analysis, defendant is not entitled to relief because he has not established that he was prejudiced by defense counsel's failure to call a toxicology expert.

To support the claim that expert testimony could have shown that defendant's statements at the hospital were not knowingly and intelligently made because defendant was still under the influence of LSD, defendant relies on the report of Dr. Cara Poland, a board-certified physician in addiction medication, which he submitted in support of his motion for a new trial. Indeed, in ruling on defendant's motion to suppress, the trial court suggested that testimony from a toxicology expert may have been helpful, and explained that in the absence of such evidence, it was required to rely on the evidence of defendant's conduct and Deputy Ruggles's observations at the time of the interview. However, we disagree that Dr. Poland's report establishes that defendant was incapable of comprehending what was occurring and unable to knowingly and intelligently answer questions at the time he was interviewed.

Dr. Poland's report generally explains the medical and scientific effects of LSD, and provides a timeline for how it typically affects users, but her timeline is not inconsistent with the timeline of the events in this case such that it contradicts the witness testimony describing the changes in defendant's behavior and his capacity to knowingly and voluntarily make a statement at the time he was questioned. Dr. Poland provided the following timeline of the effects of defendant's LSD consumption:

> In terms of the case timeline, if we assume [the victim] and [defendant] consumed the LSD at 11:30pm, directly after [the victim's] mother went to bed, they would have taken effect sometime between 12:00am and 1:00am. It is clear from the testimony that [the victim] took a smaller dose than [defendant]. Continuing with the earliest and shortest time course of LSD, its peak effect would have been around 3:00am. If we further consider the shortest course being an onset of action of 30 minutes, a peak of 3 hours, and a duration of 6 hours, this places the end of the psychedelic effects at 5:30am. However, if we consider the longest course being an onset of action 90 minutes from ingestion, with a peak at 5 hours and a duration of action of 12 hours, this will place the timeline out as far as 11:30am.

Dr. Poland stated that there were other variables that could affect this timeline, such as the number of LSD tablets ingested, the use of other drugs such as marijuana, or whether the LSD tablet was adulterated with other drugs or substitute substances, but she did not offer an opinion on how such other factors could have affected the timeline. She was only able to conclude that it was "possible" that defendant "was still experiencing the effects of LSD intoxication when he was read and ultimately waived his *Miranda* rights."

The timeline described in Dr. Poland's report aligns with the timeline described by witnesses. AC testified that she and defendant ingested the LSD after AC's mother went to bed, which was at 11:30 p.m. It was some unspecified time thereafter that defendant attempted to sexually assault AC, but AC's mother described confronting defendant in his erratic state sometime between 2:00 and 2:30 a.m., which would be consistent with the peak time of 3:00 a.m. indicated by the shortest course of LSD indicated by Dr. Poland. According to Dr. Poland, the psychedelic effects of defendant's LSD intoxication (again under the shortest course) would have been expected to continue until approximately 5:30 a.m., which is near the time defendant was taken into custody and observed to still be making nonsensical statements and exhibiting hallucinatory behavior. However, the effects of the drug would have been expected to end sometime after that, which again is consistent with the witness testimony describing how defendant, after being taken to the hospital, eventually stopped his erratic behavior and stopped making nonsensical statements. Further, he demonstrated an awareness that he was in a hospital before asking to speak to Deputy Ruggles at approximately 6:40 a.m. Although Dr. Poland explained that there were other factors that could have extended the timeline, because any extension was speculative, it would be necessary to rely on witness accounts of defendant's behavior and apparent awareness of his situation to evaluate whether he was still experiencing the effects of his LSD consumption after 5:30 a.m., which is when the psychedelic effects of defendant's LSD consumption would have begun to end according to Dr. Poland's timeline.

Notably, defendant was able to describe how he was feeling and comprehend what was going on at the time he was questioned. In denying defendant's motion to suppress, the trial court found that during the time that defendant was at the hospital, his "demeanor changed from one who was suffering from the effects of a hallucinogenic drug, including hallucinations, to someone who recognized the situation that he was in, recognized the location that he was in[,] [r]ecognized the role of the deputy[,] [v]oluntarily submitted—sought conversation with the deputy, and . . . understood . . . his circumstances." These findings are supported by the evidence and not inconsistent with Dr. Poland's report. Accordingly, defendant has not demonstrated a reasonable probability that the outcome of the suppression hearing would have been different if defense counsel had presented Dr. Poland's testimony.

Defendant also argues that defense counsel was ineffective for not calling Dr. Poland to testify at trial to address the effects of the LSD to assist the jury in evaluating the reliability of defendant's hospital statements, and to further address whether AC's LSD use affected her ability to accurately recall what occurred with defendant. We again conclude that Dr. Poland's report fails to demonstrate that defendant was prejudiced by counsel's failure to call an expert at trial.

As already discussed, Dr. Poland's timeline generally aligned with the witness testimony and did not negate the testimony describing that defendant was no longer demonstrating the effects of his LSD intoxication at the time he was questioned. Thus, it does not establish that he was incapable of reliably describing the events related to his attempted sexual assault of AC. And apart from defendant's statements, AC described how defendant removed his socks, pants, and underwear and repeatedly stated, "We're going to do this, right?", and then climbed on top of her, began groping her, and tried to remove her shirt. Although defendant argues that an expert also could have provided the jury with a basis for questioning the reliability of AC's testimony due to her own LSD consumption, and Dr. Poland expressed in her report that AC's memory of the events *could have* been impacted by her own use of LSD, but defendant ignores that much of AC's testimony was corroborated by other witnesses.

AC described how defendant removed his pants and underwear and then tried to sexually assault her, and how she was able to get away and run upstairs. Her mother testified that AC ran into her bedroom in the middle of the night to get away from defendant, and further testified that she confronted defendant, who was naked from the waist down, in the upstairs hallway. Defendant was still half naked when he ran from the house and when he was later apprehended by the police. Considering the proposed timeline evidence, AC's testimony describing defendant's conduct and statements surrounding the attempted assault, and that AC's mother corroborated AC's accounts of defendant pursuing AC while naked from the waist down, there is no reasonable probability that the outcome of defendant's trial would have been different had a toxicology expert been called.

To the extent that defendant requests a remand for an evidentiary hearing on his ineffective-assistance claim, we conclude that remand is not warranted. The trial court already conducted an evidentiary hearing about the admissibility of defendant's statements. Further, as we have explained, even if Dr. Poland's proposed testimony is credited, it does not establish that there is a reasonable probability that the outcome of the suppression hearing or defendant's trial would have been different.

## II. VOLUNTARY INTOXICATION AS A DEFENSE

Next, defendant argues that MCL 768.37(1), which provides that voluntary intoxication is not a defense to a crime, is unconstitutional because it violates his due-process right to present a defense. We disagree.

As explained in *In re Ayres*, 239 Mich App 8, 10; 608 NW2d 132 (1999):

> This Court reviews constitutional issues de novo. *People v Darden*, 230 Mich App 597, 600; 585 NW2d 27 (1998). Statutes are presumed to be constitutional, and the courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent. *Caterpillar, Inc v Dep't of Treasury*, 440 Mich 400, 413; 488 NW2d 182 (1992). *McKeighan v Grass Lake Twp Supervisor*, 234 Mich App 194, 201; 593 NW2d 605 (1999). The party challenging a statute has the burden of proving its invalidity. *People v Thomas*, 201 Mich App 111, 117; 505 NW2d 873 (1993). [*In re Ayres*, 239 Mich App 8, 10; 608 NW2d 132 (1999), superseded in part on other grounds as stated in *People v Dipiazza*, 286 Mich App 137; 778 NW2d 264 (2009)]

MCL 768.37 provides, in pertinent part:

> (1) Except as provided in subsection (2), it is not a defense to any crime that the defendant was, at that time, under the influence of or impaired by a voluntarily and knowingly consumed alcoholic liquor, drug, including a controlled substance, other substance or compound, or combination of alcoholic liquor, drug, or other substance or compound.

> (2) It is an affirmative defense to a specific intent crime, for which the defendant has the burden of proof by a preponderance of the evidence, that he or she voluntarily consumed a legally obtained and properly used medication or other substance and did not know and reasonably should not have known that he or she would become intoxicated or impaired.

MCL 768.37 was adopted by 2002 PA 366, effective September 1, 2002. Before this statute was adopted, voluntary intoxication was a recognizable defense only to a specific intent crime. *People v Korona*, 119 Mich App 369, 371; 326 NW2d 143 (1982); see also 1 Gillespie, Michigan Criminal Law & Procedure (3d ed), § 5:55, pp 304-305. Assault with intent to commit CSC involving penetration is a specific intent crime. *People v Nickens*, 470 Mich 622, 631; 685 NW2d 657 (2004).

In *People v Hayes*, 421 Mich 271, 278; 364 NW2d 635 (1984), our Supreme Court agreed that a criminal defendant has a state and federal constitutional right to present a defense under US Const, Ams VI, XIV; Const 1963, art 1, §§ 17, 20. But while the right to present a defense is a fundamental element of due process, that right is not absolute. *Id.* at 279. A defendant must still comply with established rules of procedure and evidence designed to ensure both fairness and reliability in determining guilt and innocence. *Id.*, citing *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973).

Defendant concedes that his challenge to the constitutionality of MCL 768.37(1) cannot succeed under the federal constitution, observing that the United States Supreme Court has rejected a similar argument under the federal constitution. See *Montana v Egelhoff*, 518 US 37; 116 S Ct 2013; 135 L Ed 2d 361 (1996). He argues that the protections afforded by the Michigan Constitution should, however, be construed more broadly to preclude a ban on voluntary intoxication as a defense to a crime.

In *People v Goldston*, 470 Mich 523, 534; 682 NW2d 479 (2004), the Court discussed when it is appropriate to interpret our state constitution differently than the federal constitution

> In interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical. *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003). Conversely, we are free to interpret our Constitution consistent with the United States Supreme Court's interpretation of the United States Constitution unless a compelling reason precludes us from doing so. As this Court stated in *Sitz v Dep't of State Police*, 443 Mich 744, 758; 506 NW2d 209 (1993), however, a " 'compelling reason' should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law." Rather, we must determine what law " 'the people have made.' " *Id*. at 759, quoting *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884). The following factors are relevant in determining whether a compelling reason exists to interpret the Michigan Constitution and the United States Constitution differently:
>
> > 1) [T]he textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preexisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest. [*People v Collins*, 438 Mich 8, 31 n 39; 475 NW2d 684 (1991).]
>
> The above factors are also helpful in determining the intent of the ratifiers with respect to our state constitutional provisions. [Footnote omitted.]

In *People v Carpenter*, 464 Mich 223, 240-241; 627 NW2d 276 (2001), our Supreme Court declined to hold that the Legislature's adoption of new legislation that eliminated diminished capacity, short of insanity, as a defense to a crime violates a defendant's right to due process, essentially following federal law. In *Carpenter*, the Court concluded that state legislatures properly may preclude defendants from offering evidence of mental and psychological deficiencies to challenge the elements of the crime. *Id.* at 241. While defendant cites *Carpenter*, he relies only

-11-

on Justice Marilyn Kelly's dissenting opinion in support of his argument.[4]  Dissenting opinions are not precedentially binding.  *Hamed v Wayne Co*, 490 Mich 1, 32 n 82; 803 NW2d 237 (2011).

The only reason offered by defendant for interpreting Michigan's constitution more broadly than the federal constitution is, that this state places more importance or significance on public health matters, such as abortion rights and substance-abuse treatment.  Defendant notes that Michigan has adopted measures to differentiate how drug addicts may be processed in the criminal justice system, such as the implementation of drug-treatment courts.  However, these observations have little to do with the Legislature's decision to eliminate voluntary intoxication as a defense in criminal proceedings.  The public health concerns associated with drug abuse discussed by defendant do not undermine the state's interest in deterring crime and holding wrongdoers responsible for the consequences of their voluntary decisions to use illegal controlled substances.  This state's adoption of drug-treatment courts reflects a purpose of modifying punishment to emphasize treatment as a way of curbing recurring criminal activity by drug offenders, not a purpose of excusing wrongful acts to allow wrongdoers to escape punishment and avoid accountability.

In its decision denying defendant's motion for a new trial, the trial court rejected defendant's argument that MCL 768.37(1) is unconstitutional, stating:

> A restriction on the right to present relevant evidence violates due process only when the restriction offends some principle of justice so rooted in the traditions and conscience of the people as to be ranked as fundamental.  The United States Supreme Court has held that a defendant's right [to] have a jury consider evidence of his voluntary intoxication in determining whether he possessed the mental state required for a conviction is *not* a fundamental principle of justice.  Thus, a statute prohibiting voluntary intoxication as a criminal defense is not unconstitutional.  Moreover, these types of statutory bans are consistent with states' interests in deterring crime, holding wrongdoers responsible for the consequences of their actions and excluding misleading evidence.  Given the above, there is nothing to suggest that MCL §768.37(1) violates a fundamental principle of justice.  Therefore, the Court finds that MCL §768.37(1) is constitutional and did not deprive the Defendant of his due process right to present a defense.  [footnotes omitted]

---

[4] Defendant notes that our Supreme Court heard oral argument on whether to overrule *Carpenter* in *People v Tyson*, 509 Mich 1049; 974 NW2d 838 (2022).  However, the Court in *Tyson* subsequently denied leave to appeal because it was no longer persuaded that the questions presented should be reviewed by the Court.  *People v Tyson*, 511 Mich 1080; 992 NW2d 293 (2023).

We agree with the trial court and, accordingly, we reject defendant's argument that MCL 768.37(1) is unconstitutional under the state constitution. Defendant has not met his burden of overcoming the presumptive validity of the statute.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that trial counsel was ineffective for eliciting harmful testimony during his cross-examination of AC. We disagree.

Decisions regarding what evidence to present is presumed to be a matter of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy. *Davis*, 250 Mich App at 368. To establish ineffective assistance of counsel, defendant must overcome a strong presumption that his attorney exercised sound trial strategy and show that, but for counsel's error, the outcome of the trial would have been different. *Id*. at 368-369. But, counsel's strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable." *Douglas*, 496 Mich at 585.

Defendant challenges the following portion of defense counsel's cross-examination of AC:

*Q*. Do you remember telling Deputy Ruggles that [defendant] tried to take your pants off, while you were sitting on the couch?

*A*. I don't remember that part. I'm sorry.

*Q*. Do you remember telling Deputy Ruggles that [defendant] rubbed and humped your knee while you were sitting on the couch?

*A*. I'm sorry.

*Q*. You don't remember?

*A*. No.

*Q*. Do you remember telling Deputy Ruggles that he had grabbed the outside of your thigh?

*A*. No.

*Q*. Do you remember telling Deputy Ruggles that when you tried to get up, he choked you?

*A*. No.

*Q*. And that he choked you for 10 to 15 seconds?

*A*. No.

Defendant argues that it was unreasonable for defense counsel to question AC about factual acts that could have supported an intent to commit sexual penetration that were not established by

AC's testimony on direct examination. On direct examination, AC described defendant telling her that they were "going to do this" and groping her breast while trying to remove her shirt, but she did not believe that defendant tried to remove her shorts, and she did not mention defendant humping her knee or grabbing her thigh. According to Deputy Ruggles, however, AC reported that defendant tried to remove her pants during the assault, that defendant rubbed or humped her knee while she sat on the couch, and that defendant also grabbed her thigh.

It is apparent that defense counsel was familiar with the details that appeared in Deputy Ruggles's report and that AC did not testify to every single one of those details in her direct examination testimony at trial. It was not objectively unreasonable for defense counsel to attempt to show, as trial strategy, that AC's description of the assault to Deputy Ruggles differed from her description of the assault at trial and that these differences undermined the credibility of her trial testimony that defendant attempted to sexually assault her. This strategy, in fact, allowed defense counsel to argue during closing argument that "[AC's] testimony about what happened, [AC's] recollection about what happened, is not credible." Although defendant complains that he was prejudiced by defense counsel's questions because they mentioned facts that could support an intent to commit a sexual assault that were not mentioned in AC's testimony, this concern is unfounded.

First, the questions were only directed at what AC remembered telling Deputy Ruggles, not at what defendant actually did. Second, AC confirmed that she did not remember telling those things to Deputy Ruggles, and she did not otherwise claim that any of the acts mentioned in defense counsel's questions actually happened. Moreover, the trial court instructed the jury that, in deciding defendant's guilt or innocence, it could only consider evidence that has been properly admitted, that the lawyers' questions to witnesses are not evidence, and that a lawyer's questions should be considered only to the extent that they give meaning to a witness's response. "Jurors are presumed to follow their instructions." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted). Under the court's instructions, because AC denied any memory of telling Deputy Ruggles any of the facts mentioned in defense counsel's questions, and because AC did not otherwise claim in her responses to the questions that any of the mentioned acts actually occurred, there was no basis for the jury to rely on the mentioned facts to find that defendant intended to commit a sexual assault. For these reasons, defendant has not overcome the presumption that defense counsel's cross-examination of AC was objectively reasonable.

Defendant has also failed to establish that but for counsel's purportedly unreasonable cross-examination of AC, the result of the proceeding would have been different. Again, AC unequivocally testified that defendant stripped naked from the waist down, pushed her into the couch, repeatedly told her that they were "going to do this" and groped her breast while trying to remove her shirt. Her testimony, by itself, was sufficient to support defendant's conviction, *Szalma*, 487 Mich 724, and any error in counsel's cross-examination was thus harmless.

## IV. PROSECUTORIAL MISCONDUCT

Defendant next argues that he is entitled to a new trial because of the prosecutor's misconduct. Defendant did not preserve his claims of misconduct with a timely objection at trial. *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008). Therefore, we review this

issue for plain error affecting the defendant's substantial rights. *People v Abraham,* 256 Mich App 265, 275; 662 NW2d 836 (2003). This Court will reverse "only when a plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 275-276. This Court "will not find error requiring reversal if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction." *People v Williams*, 265 Mich App 68, 71; 692 NW2d 722 (2005). Defendant alternatively argues that defense counsel was ineffective for not objecting to the alleged misconduct. Because no evidentiary hearing was held, our review of the ineffective-assistance claim is limited to errors apparent from the record. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

Claims of prosecutorial misconduct are decided case by case and the challenged conduct must be viewed in context. *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996). The test for prosecutorial misconduct is whether the defendant was denied a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995). In *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014), this Court observed:

> A prosecutor has committed misconduct if the prosecutor abandoned his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial. A prosecutor can deny a defendant his or her right to a fair trial by making improper remarks that "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's comments in context and in light of the defendant's arguments. [Footnotes omitted.]

Defendant first argues that the prosecutor made improper comments during jury voir dire that encouraged the jury to punish defendant for society's failure to hold perpetrators of sexual assault accountable for their conduct against women:

> Okay. You know, and like Ms. Kellogg was saying, I think it's something that a lot of women have to deal with. I know my—my wife, when we started dating, worked at Don's Drive In; and she used to tell me all the time about people who would grab her or slap her as she was going by. It never goes anywhere, there's not a case involved there, but it's still assault; right? And it's something that—that a lot of people have to deal with, unfortunately.
>
> So thank you for sharing. Anybody else? Yes?

It is apparent that the prosecutor's comments were responsive to an earlier exchange with Juror Kellogg, who responded as follows after the jurors were asked whether anyone had been the victim of a sexual assault or knew someone who was a sexual assault victim:

> *JUROR KELLOGG*: I just feel like it's a common story for a lot of women, to experience sexual assault in one way or another.
>
> *MR. ATTWOOD*: It is. It is.

-15-

And do you have an experience that you're personally connected to? You don't have to share.

*JUROR KELLOGG*: Yeah. I would just say that it's just a very familiar story.

*MR. ATTWOOD*: Yeah, sure. It's something that women have to deal with.

*JUROR KELLOGG*: Yes. Yes.

*MR. ATTWOOD*: Do you think your feelings on the subject, or history on the subject would make it difficult for you here? Or could you be fair, and listen to the facts, listen to the testimony, and render a decision based on those things, and not maybe what happened in your past, or what you—

*JUROR KELLOGG*: I think I would like to consider being fair. But I would just also like to acknowledge it's a pretty common story.

*MR. ATTWOOD*: Yes, exactly. And it is. And that's—we don't ask you to leave your—your personal history at the door, when you come in to be a juror. All we ask is that you give both sides a fair shake. Listen to the evidence, and make a decision on that.

Do you feel comfortable doing that?

*JUROR KELLOGG*: Mm-hmm.

The record does not support defendant's claim that the challenged remarks improperly urged the jury to punish defendant for society's failure to hold perpetrators of sexual assault accountable. The challenged remarks were part of a permissible exchange in which the prosecutor was attempting to explore the individual jurors' views of sexual assault, to determine whether any jurors had personal experiences might prevent them from being fair and impartial. The prosecutor did not randomly refer to his wife's experiences, but did so as a follow up to Juror Kellogg's comments about sexual assault being a "common story for a lot of women." There was nothing in the prosecutor's comments that urged the jury to ignore the evidence or suggested that the jury had some duty or obligation to punish defendant to hold him responsible for society's failure to hold other perpetrators of sexual assault accountable for their acts. Indeed, although agreeing that sexual assault was something that women have to deal with, the prosecutor emphasized: "All we ask is that you give both sides a fair shake. Listen to the evidence, and make a decision on that." Viewed in context, the prosecutor's remarks were not improper. And because the remarks were not improper, defense counsel was not ineffective for failing to object. Counsel is not ineffective for failing to make a futile objection. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant also argues that the prosecutor improperly elicited sympathy for AC by prompting testimony that defendant's assault had exacerbated her pre-existing post-traumatic stress disorder condition and caused her to have panic attacks. The prosecutor also elicited from AC's mother that, after defendant's assault, AC stopped eating for a period of time, she stopped

-16-

attending social functions and hanging out with people, and she experienced increased anxiety that sometimes caused her to vomit. During closing arguments, in the context of commenting on AC's credibility, the prosecutor argued:

> [AC] did not want to be here testifying about this. She is not out for vengeance. She is not out for blood. The defendant's actions in November forced her into this uncomfortable situation. She was victimized in a pretty horrific and terrifying way. And she's dealt with a great deal of anxiety and depression that— that has affected her life negatively—significantly.

It is improper for a prosecutor to appeal to the jury to sympathize with a victim. *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). We agree with the trial court's observations when denying defendant's motion for a new trial with respect to this issue that the challenged questions were intended to elicit information relevant to AC's credibility. AC's reactions after the incident, both emotionally and physically, were probative of the credibility of her allegations. Moreover, the challenged questioning was not extensive, and the prosecutor only briefly commented on this evidence during closing argument, which indicates that it was not designed to ask the jurors to suspend their judgment and decide this case based on sympathy for the victim. *People v Hoffman*, 205 Mich App 1, 21; 518 NW2d 817 (1994). Accordingly, the questions and comments do not constitute plain error. Furthermore, to the extent that the questions and comments could be perceived as evoking sympathy, the trial court protected defendant's right to a fair trial by instructing the jury that it was required to decide the case "based only on the evidence and my instructions on the law" and "[y]ou must not let sympathy or prejudice influence your decision."

Finally, because the prosecutor's questions and comments were not plainly improper, defense counsel's failure to object was not objectively unreasonable, and further, because the trial court's instructions protected defendant's right to a fair trial, defendant cannot establish that he was prejudiced by counsel's failure to object.

## V. CUMULATIVE ERROR

Defendant argues that reversal is required because the cumulative effect of defense counsel's multiple errors deprived him of a fair trial. Although a single error in a trial may not provide a basis for granting a new trial, the cumulative effect of multiple minor errors may add up to error requiring reversal. *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

The record does not support defendant's claim that there were multiple errors by defense counsel. As explained earlier, defendant has not demonstrated that a defense expert would have made a difference in the outcome of the suppression hearing or defendant's trial. Similarly, counsel's questioning of AC about other acts mentioned in her statement to Deputy Ruggles was neither objectively unreasonable nor prejudicial. Finally, there is no merit to defendant's claims that defense counsel was ineffective for failing to object to the prosecutor's comments during voir dire or the prosecutor's questions or comments regarding the impact of the assault on AC. Because defendant has failed to establish that multiple errors occurred, there can be no cumulative effect that deprived defendant of a fair trial.

-17-

## VI. EX POST FACTO LEGISLATION

In a one-paragraph argument, defendant asserts that he should not be required to register as a sex offender because the offense was committed in 2020, before the effective date of the 2021 version of SORA, as enacted by 2020 PA 295, effective March 24, 2021. Defendant contends that the 2021 SORA qualifies as criminal punishment, and therefore, applying it to him retroactively violates constitutional prohibitions on ex post facto laws. Because defendant did not raise this issue in the trial court, it is unpreserved, and therefore, review is limited to plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The construction and application of the SORA presents a question of law, which is reviewed de novo. *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009).

We do not disagree with the premise of defendant's argument that the 2021 SORA may not be applied to him retroactively because he committed the underlying offense in November 2020, before the effective date of the 2021 SORA amendments. See *People v Betts*, 507 Mich 527, 573-574; 968 NW2d 497 (2021). However, the only SORA requirement that defendant takes issue with is the requirement that he register as a sex offender, and he was subject to that requirement under the version of SORA in effect at the time of the offense. See MCL 28.723(1)(a), as amended by 2011 PA 17, effective July 1, 2011 (requiring an individual convicted of a "listed offense" after October 1, 1995, to register as a sex offender), and MCL 28.722(j) and (w)(*iv*), as amended by 2014 PA 328, effective January 14, 2015 (defining a "listed offense" as including a "tier III" offense," which in turn is defined as including a violation of MCL 750.520g(1)[5]). Accordingly, defendant has not established any ex post facto violation.

## VII. CRUEL OR UNUSUAL PUNISHMENT

Finally, defendant argues that the requirement of lifetime registration under the SORA amounts to cruel or unusual punishment in violation of the Michigan Constitution. We disagree.

Because defendant was convicted of violating MCL 750.520g(1), he was a "Tier III" offender, see MCL 28.722(v)(*ii*) and (w)(*iv*), as amended by 2014 PA 328, effective January 14, 2015, subject to lifetime registration under SORA, see MCL 28.725(12), as amended by 2011 PA 17, effective July 1, 2011. Defendant argues that the requirement of lifetime registration amounts to cruel or unusual punishment.

Defendant appears to challenge the constitutionality of the SORA lifetime-registration requirement both on its face and as applied to him.

---

[5] The definitional portion of the SORA was amended by 2014 PA 328, effective January 14, 2015, but none of the relevant definitions have changed. The 2011 SORA contained these same definitions, which were then codified at MCL 28.722(k) and (w)(*iv*), and the same definitions currently are used in the 2021 SORA, but are codified at MCL 28.722(i) and (v)(*iv*).

A facial challenge involves a claim that a legislative enactment is unconstitutional on its face, in that there is no set of circumstances under which the enactment is constitutionally valid. *Bonner v Brighton*, 495 Mich 209, 223 n 26; 848 NW2d 380 (2014). "An as-applied challenge, to be distinguished from a facial challenge, alleges 'a present infringement or denial of a specific right[,] or of a particular injury in process of actual execution' of government action." *Id*. at n 27 (citation omitted). [*People v Wilder*, 307 Mich App 546, 556; 861 NW2d 645 (2014).]

The federal constitution prohibits "cruel *and* unusual" punishment, US Const, Am VIII, whereas the state constitution prohibits "cruel *or* unusual" punishment, Const 1963, art 1, § 16. In *People v Lymon*, 342 Mich App 46, 82; 993 NW2d 24 (2022), this Court explained:

To determine whether a punishment is cruel or unusual, courts assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. *People v Bullock*, 440 Mich 15, 30, 33-34; 485 NW2d 866 (1992).

Applying the factors quoted in *Lymon*, we do not find that SORA lifetime-registration requirement is unconstitutional.

The offense that resulted in defendant being required to register under SORA for life is assault with intent to commit CSC involving penetration, which is punishable by imprisonment for up to 10 years. MCL 750.520g(1). The crime is a serious offense even though it is not the most serious form of sexual assault. The victim was an adult who had also ingested LSD, like defendant. Although defendant and the victim knew each other and had an ongoing relationship, it was not a sexual relationship and the victim had previously told defendant that she was not interested in a dating relationship. The evidence at trial indicated that the victim did not do anything to initiate any sexual activity on the night of the assault, but rather told defendant that she did not want to have sex with him when he raised the subject. Defendant persisted, however, to the point of removing his pants and underwear and then attempting to physically force the victim into engaging in sex. According to the victim, defendant climbed on top of her, groped her, and attempted to remove her shirt, but she was able to fight back and get away. Even after the victim verbally told defendant that she did not want to have sex, physically resisted his advances, and was able to initially get away, defendant went after her again and continued to assault her. The victim again was able to get away and she ran upstairs to her mother's room. Defendant followed the victim upstairs, but the victim's mother intervened. Although the offense may not have been the most heinous of sexual offenses, the circumstances were still serious and had a lasting impact on the victim. In this case, the SORA's lifetime-registration requirement is not unduly harsh in comparison to the gravity of the underlying offense (*Lymon* factor (1)).

Relying on our Supreme Court's decision in *Parks*, 510 Mich at 225, defendant argues that application of the lifetime-registration requirement to him is nevertheless unduly harsh and disproportionate because of his youth. The Court in *Parks* concluded that a mandatory sentence

of life imprisonment without parole for 18-year-old offenders convicted of first-degree murder is unconstitutionally cruel or unusual because young offenders are not yet fully developed in their decision-making abilities and are more susceptible to negative outside influences. *Id.* at 250-251. Defendant's reliance on *Parks* is misplaced, given that a requirement of lifetime SORA registration cannot even remotely be compared to the harshness of lifetime imprisonment without the possibility of parole. Furthermore, the registry is designed to track the progress of a convicted offender and, even if defendant was not a mature adult when he committed the offense, his registration is a way to both protect society and prompt defendant to conform his conduct to the law. We are not persuaded that defendant's age of 18 years at the time of the offense is justification for sparing him from the requirement of lifetime registration under SORA.

Turning to the second factor indicated in *Lymon*, although there appears to be no comparable registration requirement for other types of offenses, this Court in *People v Jarrell*, 344 Mich App 464, 485-486; 1 NW3d 359 (2022), concluded that lifetime registration is not unduly harsh compared to other mandatory penalties, explaining:

> Second, Jarrell's mandatory lifetime sex offender registration is not unduly harsh as compared to penalties imposed for other offenses in Michigan. Mandatory punishment provisions are not uncommon, particularly for CSC-I convictions. For instance, depending on the age of the offender and victim, a CSC-I conviction may involve a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). "Legislatively mandated sentences are presumptively proportional and presumptively valid," *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011), and "a proportionate sentence is not cruel or unusual," *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). Jarrell has failed to overcome the presumption that mandatory lifetime sex offender registration is proportional as applied to his case, and he cannot show that such a penalty is disproportionately harsh compared to other penalties imposed in Michigan.

This Court similarly rejected this same argument in *Malone*, ___ Mich App at ___; slip op at 6-7, stating:

> Defendant also contends that the penalty imposed, mandatory lifetime registration, is exceedingly rare and more severe because the punishment will last longer on a youthful offender as opposed to an adult. Lifetime registration, however, is not the only mandatory penalty imposed in Michigan. Mandatory lifetime imprisonment is the penalty imposed for first-degree murder, MCL 750.316(2). Two years' imprisonment is the mandatory punishment for the possession of a firearm during the commission of a felony, MCL 750.227b(1). A second conviction results in the mandatory punishment of five years' imprisonment, and a third conviction is subject to a mandatory 10-year period. *Id.* Additionally, certain CSC-I convictions may impose a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). A sentence mandated by the Legislature is presumptively proportional and presumptively valid. *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). A proportionate sentence is not a cruel or unusual

punishment. See *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). The Legislature has determined offenses for which mandatory punishments are warranted, including murder, weapon, and sex offenses, without regard to the age of the offender. These mandates are presumptively proportional and valid. Accordingly, this factor does not weigh in favor of finding cruel or unusual punishment when examining SORA requirements imposed on a youthful offender. [Footnote omitted.]

Applying the analysis in *Malone* and *Jarrell*, defendant has not shown that this factor supports his argument.

As to the third *Lymon* factor, comparing Michigan's registration requirement to penalties adopted for like offenses in other states, this Court has again concluded that lifetime registration is not unusual punishment. In *Jarrell*, 344 Mich App at 486, this Court observed that "[m]any states have a tiered system for sex offender registration, with lifetime registration reserved for the most heinous perpetrators of sexual assault" (footnote omitted). And in *Malone*, ___ Mich App at ___; slip op at 7, this Court stated:

Next, defendant notes that an examination of other jurisdictions reveals that only 18 states have substantially implemented the federal Sex Offenders Registration and Notification Act, 42 USC 16901 *et seq*., there is no uniform view that these registries operate to improve public safety, and research indicates that the dangerousness of sex offenders had been "overblown." He further submits that individual considerations of the juvenile are more desirable and appropriate. However, defendant fails to recognize that an individualized approach was taken pertaining to his own circumstances. Specifically, defendant was charged with CSC-I and was permitted to plead to CSC-II. Applying Public Act 150, defendant was remanded to a juvenile facility for treatment. [Footnote omitted.]

Thus, defendant has not shown that the SORA is unique among the states. This factor does not support his argument.

Fourth, whether the registration requirement advances the goal of rehabilitation is subject to debate. In *Betts*, 507 Mich at 560-561, the Court commented:

Defendant—as well as his similarly situated counterparts throughout the nation—endeavors to demonstrate that the dangerousness of sex offenders has been historically overblown and that, in fact, sex offenders are actually less likely to recidivate than other offenders. Further, he argues that sex-offender registries have dubious efficacy in achieving their professed goals of decreasing recidivism. A growing body of research supports these propositions. See, e.g., United States Department of Justice, Alper & Durose, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-2014)* (May 2019), available at <https://www.bjs.gov/content/pub/pdf/rsorsp9yfu0514.pdf> (accessed June 4, 2021) [https://perma.cc/U9HY-MJ7F] (concluding that sex offenders are less likely than other offenders to be rearrested for any crime); Huebner et al, *An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri* (July 1, 2013), p

72, available at <https://www.ncjrs.gov/pdffiles1/nij/grants/242952.pdf> (accessed June 4, 2021) [https://perma.cc/D9K4-CV5P] (concluding that residency restrictions "are unlikely to mitigate or reduce the risk of recidivism among sex offenders"); Prescott & Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J L & Econ 161, 192 (2011) (concluding that notification requirements in a typical sex-offender registry "effectively increases the number of sex offenses by more than 1.57 percent," likely "because of the social and financial costs associated with the public release of their criminal history and personal information"). For our limited purpose in examining the potential excessiveness of the 2011 SORA in regard to its public-safety purpose, these studies demonstrate that, at minimum, the 2011 SORA's efficacy is unclear.

In *Jarrell*, 344 Mich App at 486-487, this Court agreed that the SORA does not assist with rehabilitation, stating:

> Finally, considering whether lifetime registration advances the goal of rehabilitation, we agree with Jarrell that his obligations under SORA will not assist his rehabilitation. See *Betts*, 507 Mich at 556, 560-562 (recognizing a "growing body of research" that "sex-offender registries have dubious efficacy in achieving their professed goals of decreasing recidivism"). But while lifetime registration under SORA does not advance the goal of rehabilitation, the other three factors strongly support that such a punishment is neither cruel nor unusual as applied to Jarrell's CSC-I convictions. Therefore, we conclude that SORA's lifetime registration requirement is not unjustifiably disproportionate under the circumstances of this case. Jarrell has not established plain constitutional error in his as-applied challenge that the requirements of SORA violate the Michigan Constitution's prohibition on cruel or unusual punishment.

In *Malone*, ___ Mich App at ___; slip op at 8, this Court agreed with *Jarrell*'s analysis of this factor, stating:

> With regard to the fourth factor, defendant submits that mandatory lifetime SORA registration is contrary to the goal of rehabilitation. In the context of an adult tier III offender, this Court ruled that SORA's mandatory lifetime registration "will not assist [the offender's] rehabilitation." *People v Jarrell*, [344 Mich App 464, 486; ___ NW2d ___ (2022).] Regardless, this Court determined that "the other three factors strongly support that such punishment is neither cruel nor unusual . . . ." *Id*. The same is true in this case and defendant failed to meet his burden of demonstrating that the requirement of mandatory lifetime registration was invalid.

At most, defendant has shown that the rehabilitative impact of the SORA registration requirement is questionable, but when all relevant factors are considered, he has not met his burden

of proving that the SORA lifetime-registration requirement amounts to cruel or unusual punishment under the state constitution.

Affirmed.


/s/ Brock A. Swartzle
/s/ Deborah A. Servitto